Page number 21-1736 et al. A state of Jeremy Isidore Levin et al. A balance v. Wells Fargo Bank, N.A. Ms. Smith for the A balance A state of Jeremy Isidore Levin. Mr. McGill for the A balance James Owens. Mr. Locato for the FLE Wells Fargo Bank, N.A. Mr. Huda for the FLE United States. Good morning. It's great to be here in person. Your time is valuable, my time is short. So I'd like to make a couple of points from a 20,000 foot perspective that I hope will guide the panel in its resolution of this decision. In 1984, Jerry Levin escaped from captivity, being held hostage by hospital law for over a year, tortured. It was a miracle. He came home, but he was broken. He was broken because he was tortured, starved, lost his hearing, had many medical problems. There were medical bills, Levin's had to sell their home, and there was no one to really turn to for help in terms of getting compensation for all the wrongs that were done. You could get a judgment against Iran, but you couldn't collect, practically speaking. Then in 2002, another miracle happened. A TRIA was passed by Congress, and TRIA opened up a whole new area of potential collection for the judgment holders, the victims who had been the victims of terrorism. And TRIA said that you can get the blocked assets of a terrorist state or its agents or instrumentalities, blocked assets, blocked assets blocked by the government, by OFAC, by Treasury. Not assets that the victims and their lawyers go out and find and block, but blocked assets. Originally, it was being interpreted by most judges in the district courts in New York that TRIA permitted BFP blocked assets to also be collected on. And we did collect some of our judgment on those BFPs and other blocked assets in New York. Then in about 2008, Calderon came down, and the Second Circuit changed the law. And the Second Circuit said that EFTs, different from any other kinds of blocked assets, that EFTs cannot be collected on. And in order to support that decision, the Second Circuit looked at New York state law, the UCC, to create that rule of law. Before that decision, were courts using the agency theory of ownership that you proposed that we use in this case? I'm sorry, Your Honor, I'm having a hard time hearing you. I'm sorry. Forgive me. Before that case, were courts using the agency theory of ownership that you proposed in this case? So, they were using a number of different approaches. Agency theory was one of them. They were also looking at the purpose of TRIA and the language of the regulations that existed. The Massachusetts rule, is that what courts were using, that particular theory? The Massachusetts rule is part of what the district courts were looking at before Calderon. Common law, TRIA itself, the regulations, the OFAC regulations, all of that was being looked at. I sense a little bit of hedging in your answer, which I appreciate. It sounds like you're just trying to be accurate about it. But it sounds like they weren't using the kind of pure agency Massachusetts rule that's been proposed in this case. They were using maybe more of a multi-factor standard, and that was part of this. So, I think, Your Honor, that's right. It was multi-factored. And just so that it's clear, I think that the Massachusetts rule gives this court the place that it should get, that the victim should be able to collect. But I also think that this court, in its Heiser decision, departed from what Calderon did in the Second Circuit and took a different look at the UCC. So, I think you get there either way. I think if you look at the UCC as the professors, the amicus briefs, and the professors who teach UCC law understand it at a deep level. By the way, it's notable that no court has really parsed the UCC in depth. There are a lot of interpretations of it. There's a lot of paraphrasing. But there's no court that has taken a deep dive and actually quoted from the UCC itself at length and the comments to the UCC, which under the money-back guarantee rule, which Heiser recognized, which the Second Circuit did not discuss at all, and which the district court here did not discuss at all, the money-back guarantee explains that when you have your money, and everybody agrees that money in banks is a terrorist in the beginning, that's where it comes from. That's the origin of it. When you take your money and you put your money into the commercial transactions to buy a ship, as it was in this case or something else, and it goes through a bunch of different banks in the process of the EFC, the person whose money it was originally does not lose all rights to their property, such that some bank along the way becomes the absolute owner of that property. The originator, the person where it starts, retains some property rights, as the professors explain in great detail. Can I ask you, I've been trying to figure out, your client filed a writ of attachment, right, both in D.C. and in South Dakota, is that right? In South Dakota, yes, sir. And the Owens plaintiffs filed a writ of attachment in D.C., and the government filed a writ of attachment in D.C., and the government was first, right? So it seems to me that if the law is that the government, because it filed first, has priority, then for us to decide the issue that you present would be giving an advisory opinion, because you're not going to be able to get these funds anyway. So my question is, what is the law with respect to priorities when several parties, several debtors file close to each other in time? So, Your Honor, the law to priorities, we believe, is that the TRIA, which has notwithstanding language, gives the priority for TRIA victims and TRIA judgment holders to any block assets. And that would include when the government is trying to go through forfeiture, which is a whole different process. Okay, so that gets the government out of the picture. But then between you and the Owens. Where do we go? Yes. So where we would go if we fight it out to the bitter end is that we would have, in the district court, we would have a priority contest, and our position would be that the rules require the writ to be filed where the assets actually are in South Dakota, and the person who goes there first gets the priority. The reason we were in D.C. is because the forfeiture action was here, and it made sense to have decisions being made here. But the issue of priority between Owens and Levin has not been decided, and it would have to be decided below. And I will tell you this practically. Sometimes we work it out before we get to that point, and we decide to share rather than fight each other down to the death. You could go. I have several other questions that relate to the UCC itself. To apply the subrogation rule, you have to know who gave the instruction to the originator's bank, right? And the record here doesn't tell us that. It could have been just the law firm, Holman. And if that's the case, then there is no violation of the originator's instructions, and so there would be subrogation. So who is it that gave the instruction to use the New York Mellon Bank? So the originator, the terrorist entity, told its lawyer to tell Lloyd Bank to use Mellon Bank. And that's the way that chain works. At the time, Holman was an escrow agent and was representing not only KF, but also Crystal. It was a joint representation, so it couldn't have been that they were simply following the instructions just of TAFE. Is that correct? I mean, they weren't jointly representing them, right? So the law firm had a dual representation, as it were. It was an escrow agent, but it was also more than that. It was the lawyer for the terrorist TAFE. I'm going to call it TAFE. I'm not sure I'm saying it right either, but TAFE. They were the law firm advising TAFE on the transaction and perhaps other things. Remember, we're at the pleading stage here, so what we know is what we put into our pleadings and what the government put in its pleadings. But it had a dual purpose. It was representing Crystal and TAFE as escrow holder, but also TAFE as advisor in the entire transaction. So it was a law firm to TAFE. The other question I have is not dependent. I don't think it's dependent on the UCC, but it occurs to me that one of the objectives of this is not only to satisfy the judgment, but also to put pressure and control over terrorist activities, right? But I'm not sure that that would be accomplished either by your lights or even by the governments here, because whether TAFE is out of its $10 million or whatever it was, it would depend upon English law, wouldn't it? No, it depends upon American law, because the TRIA... Well, let me put it this way. If they're out of the money because Lloyds used an American bank, Wells Fargo, then why wouldn't... I don't know what English law is, but it would seem to me that TAFE would have an action against Lloyds of London and collect the $10 million from them. Somebody may or may not have an action against Lloyds of London in England, but United States law, Your Honor, governs this action and what happens vis-a-vis the victims collecting. And the reason it serves the public purpose of the terrorist regulations is you take that money out of any possibility of going upstream back to the terrorists. And there are circumstances where that might happen. Many, many years could go by, and it couldn't be the circumstances... It seems to me there might be an action against the law firm, too. I mean, of all the places to use as an intermediary, it uses the intermediary of an American bank, knowing full well that there was blocking going on. I mean, that seems to me crazy. Why not use a bank in Malaysia or something? Well, that's a question. As a practical matter, are there cases in which judgment creditors identify transactions and alert OFAC to freeze? I'm thinking about the question that Judge Randolph is asking about, in what sense does your reading of the statute serve the interests of depriving terrorists of resources? And so I'm just wondering, as a practical matter, whether the plaintiff's being interested in any way prompts or aids the government's asset freezing activity. So it does in this way. The government, of course, has access to much more information than private lawyers. Although we have spent lots of money, millions of dollars over time, private investigators trying to find assets that are money laundered, that belong to the terrorists. And we've had some success. But the other thing that allowing the private actions to go forward does, even though the government wants its forfeiture action all by itself, there are cases, there's one in New York, En-ray, 650 Fifth Avenue, where there are trio cases and forfeiture actions going in parallel. And we're working together with government. We're taking depositions, they're taking depositions. They're getting documents, we're getting documents. So we do work side by side when the court says that the victims are. Specifically, would it ever be in plaintiff's interest to trigger freezing or not? Would it be better for plaintiffs to say, we just want to catch this and not have the government even be. No, in my opinion, it's always better when the government has blocked the assets, because then we have treated with notwithstanding language. We go after the blocked assets. It's when those assets are available, it's a pretty clear path, which is why if the Heiser rule says the originator has an interest and we're allowed to go after these assets, then our course is pretty well charted. And your argument is the government comes back and says, look, we get this fund or these deposits, we put it into a fund so that all the judgment debtors would have at least a shot at having partial satisfaction. And your response is the problem with that is the government will skim off 25% of the top. That's part of it. Let me just take that point. But I'm not asking you to disclose your attorney-client relationship, but it seems to me common sense that you're doing this on a contingent fee. And if your contingent fee is, say, 30%, then there's more in the pot than if the government takes it, because you're going to skim off 30% of the recovery anyway. Skim, Your Honor, is kind of a loaded word. But most of these cases are done on contingent fees. But for the court to be absolutely clear about this, the 11s are not part of the fund and cannot be. Some people are, some people aren't. You have to give up a lot in order to be part of the fund, and the government does take a big share for all of these, if you wish. What do you have to give up? Sorry, what do you have to give up other than the government's 25%? So you have to give up certain rights to other causes of action, other assets that you're going after in different locations. So I mentioned the 650 Fifth Avenue case. That's part of it. There was a time window to go into the victim's fund. That window has closed. And also there's an amount, a cap, on how much you can recover. And the 11s has not quite reached that cap, but we're approaching it. And our $30 million judgment, which the D.C. court found was conservative. That's all compensatory? All compensatory. We didn't even seek punitive damages because, frankly, we thought, let's just stick with compensatory and try to collect those. So we have held already that of does require a property determination. What is exactly the rule that you would require, that you would ask us to adopt to determine whether the blocked assets are property of? So it's the rule that was articulated in the Heiser decision. That rule says the originator has a property interest in blocked assets that come from an EFT. So if the funds were originated by the terrorist, there is a property interest in the terrorist, notwithstanding the use of an EFT to facilitate the commercial transaction. It doesn't say property interest. It says claims. Correct? Yes, you're right. Claims. And we say and argue, Your Honor, that claims are a property interest. But you're absolutely right. So the word claims, the claims, the originator still has claims against that property. That property does not become property of a bank at the district court. It's an advantage to you, to your clients, that the government blocked these assets. And in the blocking statute, it doesn't say interest in ownership. It just says any interest. And I'm going to ask the government this because it seems to me somewhat inconsistent for the government to argue that Iran doesn't have any interest or has an interest in this. But Iran doesn't when it comes to your recovery. Do you have any clue what the interest that the government is talking about when it blocked these assets? They're talking about the interest of Iran and its funds that were put into the United States commercial system, which is forbidden by law. And the government, the government recognizes that the whole reason the government can go after this in forfeiture is that Iran started Iran and started this unlawful illegal transaction, which came into the United States. Right. We'll hear from Mr. Thank you. Thank you, Judge Pillard. It is indeed good to be back in court. I just want to start by addressing some of the questions you asked Judge Randolph. You asked where the instruction to use the intermediary comes from. I would point the court to joint appendix 166. That's the Holman letter. That is the Holman letter signed for and by James Wright, attorney for and on that. I know they said that mining services. You asked a question about the scope of the Holman representation, and I would point the court to joint appendix 117 to 121, which is sealed. So I'm not going to talk further about it. But that establishes that Holman is not acting simply as an escrow agent on behalf of both. But there was a separate representation. You asked why the government's filing of the forfeiture action doesn't resolve the case. It's because the mere filing of the forfeiture action doesn't establish a lien on the property. And this is a subject that I expect we may have further litigation with the government about. But certainly the district court did not put a resolve the case on in the government's favor. If that were the case and not, you asked why not use the Malaysian bank? You need a U.S. This transaction under the contract was to be conducted in U.S. dollars. And you need to go through a U.S. dollar bank. Where is Crystal located? Crystal Holdings is a Greek company. It's a Liberian affiliate of a Greek company. You asked about the victim's fund. My clients are participants in the victim's fund. If the notwithstanding language of TRIA means anything at all, it means that we can recover under TRIA, notwithstanding the existence of the victim's fund remedy. I would maintain the government is quite wrong to suggest that Congress in enacting the victim's fund meant to limit terrorist victims' access to other remedies. You asked about the interest in property here or the government's. What is the interest in property? I would just point the court to Joint Appendix 170, which is the blocking order, which says that the specific Let me grab that. 170? 170. Yeah. And it says that OFAC believes that a specifically designated global terrorist, which here is TAFE, quote, has an interest in the funds involved in the electronic transfer identified below. Where is that in the first paragraph? That's in the first paragraph, three lines from the bottom, Your Honor. Reforms in the funds identified below, and then it identifies. Well, that just tracks the statutory language. Actually, the statutory language, Your Honor, does refer to property or an interest in property. So it does require not merely any interest in that. Wait a minute. That is 50 U.S.C. 1702 B, or 1 B, which refers to which any foreign country or national thereof has any interest. With respect to any property. Yeah. But subject to the jurisdiction. So what I ask is whether that means that whether that covers something other than ownership, ownership interest. The government will provide its own answer to that question. I would submit that it embraces at least its continuing interest in the use of the funds that it would have if not blocked, which, of course, is a primary incident of ownership. But there is some potential daylight between that and our reading in HEISR that of means property. Absolutely. I am not arguing that the blocking regulations are coextensive with ownership. That is not our argument. But it's different than HEISR. In HEISR, the interest was a future contingent possessory interest. Right. CAFE is the undisputed only source of these funds. Right. Lloyd's Capital, Wells Capital did not contribute to this transaction. CAFE is the sole source of the funds. That is the opposite of the facts in HEISR. Right. In HEISR, somebody else's funds were just going to pass through the Iranian bank on the way to the end. My time is running really short. But for three reasons, this court should not determine ownership of a blocked asset solely by reference to Article IV-A's subrogation provision. The first is that HEISR certainly did not command it. As my colleague said, HEISR instead looked to, quote, the principles of Article IV-A. And from that concluded that, quote, claims on an interrupted fund transfer ultimately belonged to the administrator. And indeed, in HEISR, if you look at the district court opinion, Judge Lambert's opinion, page 447 at footnote 3, it says that it talks about the uncontested transactions in HEISR. And in HEISR, the transactions where the Iranian entity was the originator or the originator's bank, it was conceded that it was attachable. So it was conceded, at least up to the point of HEISR, that if Iran was the originator, it was attachable. So HEISR doesn't command it. The second point is that the risk allocation rationale of the subrogation provision is completely absent here. Just on that, was the government participant in the district court? In the court of offense it was, but not in the district court. But not in the district court, but also in this court's opinion in footnote 3, it refers to the uncontested transactions. Certainly, if it were the case that Article 4A of the subrogation provision was to be mechanically applied as the only way to determine ownership, I would have expected the government to have said something at that point in time, but it did not. The risk allocation rationale... I'm a little bit confused. Is it your position that, number one, a proper interpretation of Article 4A would result in a reversal of the district court's opinion? And that if not, then we should promulgate another common law decision to take care of this particular situation? Or is it both? It's not both. If you mechanically apply the subrogation provision here, then because Lloyds used Wells instead of Bank of New York Mellon, as the instruction reflects that I cited, because they used a different bank, then under 402E, Lloyds has the claim against Wells. And if the instruction had been followed, Tate would have the claim against Wells. So we would acknowledge that under a mechanical application of 402E, we, as the district court said, are out of luck. That, we would submit, makes no sense at all as a matter of, you know, when you line it up against the purpose of TRIA, it's impossible for me to believe that the Congress that enacted TRIA would have wanted ownership to turn on such a happenstance. And this is, you know, the more important point is that the rationale of that loss allocation provision has no footing here because there is no claim against Lloyds. As Wells says at pages 17 and 18 of its brief, Tate can have no claim against Wells, certainly not under Article 4A, which doesn't apply in the United Kingdom at all. But as Wells says, under the terms and conditions of Lloyds' banking agreement, it's highly likely that Tate has no claim. And why? Because the transaction was illegal from the get-go. There is nothing that, there is no, this is not something that Article 4A was designed to deal with. Well, I'm wondering whether it was designed to deal with blocked assets at all. That's correct. It wasn't. And, you know, but it certainly wasn't meant to deal with illegal transactions. It was meant to allocate loss, talking about the subrogation provision specifically, it's intended to allocate loss against the risk of an intermediary bank failure. And it allocates that loss to the person who chooses the intermediary bank. That's a sensible rule. If you choose the intermediary bank, you are stuck with the loss. You get, you have to try, you are stuck collecting against that basically empty pocket. And Mr. McGill, when you say an intermediary bank failure, what are the common kinds of failures you're talking about? While a wire transfer is proceeding, you know, the FDIC closes the bank because it... So the bank actually going... The bank... Are there, there must be a bunch of other kinds of errors or mishaps that this... Sure. When a transaction miscarries, but that's not, you know, so then the risk of loss is effectively minimal, right? The risk of loss is zero. The transaction miscarries for some reason or another, then Lloyds would, you know, in this case, Lloyds would go to Wells and say, you've got to pay me because I have to pay Kate. And that's a sensible rule, and it's what essentially Heizer says at the end of its opinion, that we unravel these transactions backwards and... What do you mean miscarries? You mean it doesn't happen or the money gets sent off to the wrong place or just in common sense terms? I wish I could say in common sense. I'm just parroting what the language of Article 4A in the comments. So what they meant by it, I think just is that they try to embrace all the possible rationale or ways in which a transaction could go bad. But the primary one they talk about in the comments is if the bank, quote, suspends payments, which means, you know, if it's there. And so that's what 402E is all about. It's about allocating the risk of loss. But here, as Wells says, the risk of loss lies with Kate. Why? Because the transaction was illegal from the beginning. Well, it wasn't illegal from the beginning. I'm not sure about that because it became illegal only because it was using an American bank. If they had used all foreign banks, there's no illegality that I see. I'll take that point, Judge Randolph, but what I meant with the transaction from the beginning was in U.S. dollars and contemplated use of the U.S. banking system. So does Kate not have a claim against Lloyds? Because Lloyds was the one who chose Wells Fargo? Not according to Wells. And Kate is – they're terrorists and pirates. I mean, they're not going to come to court in London and say, you know, we want our $10 million back from Lloyds. But I would take – I would put two things on the table. One – or three. One is page 17 and 18 of Wells' brief where they say that it's very likely that Lloyds doesn't have any claim against it from TAFE. Two, Lloyds has never shown up in two years. They don't – they apparently are not very interested in this case, and that makes sense because none of their capital is at risk. And three, there's this – there is Article 4A statute of repose, which generally – which is Section 505, which generally provides for a one-year claim limitation. However, again, Article 4A doesn't apply in the U.K., so it's not – this is never – this is just yet another reason why Article 4A is not a perfect fit for blocked terrorist transactions, which are almost definitionally international. One of the virtues of federal common law is that no matter where you go in the country, you'll be dealing with the same law. If we split with the Second Circuit, the government says that's going to encourage form shopping in cases like this. What's your response to that? I would expect the government would seek review in the Supreme Court if that's a serious concern and resolve it that way. But I think – I'm not going to dismiss the reality that if you adopt my rule, then people can win here and not win in the Second Circuit. But the Second Circuit doesn't apply federal common law. The Second Circuit applies New York state law, which they have said must – they must mechanically apply the UCC. And my meta point to the panel is that that makes no sense in this situation. Article 4A doesn't deal with blocked transactions at all. It's not intended to deal with terrorists. And the subrogation provision has nothing to do whatsoever with purposes of TRIA. Right. So Tranoff was asking you, are you arguing for a less mechanistic application of Article 4A or that we should fashion a different federal common law rule? And you were – I think the bulk of your response was in opposition to the mechanistic application of Article 4A. And so affirmatively, the rule you're asking us to apply is? I think what the court said in Heiser is sufficient. But Heiser was not determining the property – affirmatively, the property interest of the originator. It was – it had a much easier task. We had a much easier task there, which was to simply say that North Korea, as the ultimate intended beneficiary, had under no reading a property interest. And so the sort of throwaway line, which may indeed be valid, and I think puts a meat on those bones, that it's unraveled toward the originator. But is there nothing more sort of rigorous that you would offer for how we look at that? I definitely would not call it a throwaway line. But the – what the court did in Heiser, on our view, was, as it says, apply the principles of Article 4A. And it – that those principles be what informed the federal common law. We have provided in our brief other common law principles that have deep roots that – from which you – that support that rule in Heiser. We've kept you a long time, but let me just follow up. You say the principles of Article 4A, but Article 4A and its distinctiveness from preceding common law is precisely to say, look, if you want – if you're a creditor and you want to go against either the originator or the beneficiary, you have to do it before the EFT gets going or after it finishes. Like, to the extent that the UCC or Article 4A is distinctive, that's what it's about. And I get your point that that seems to be in profound tension with TRIA, to the extent that TRIA is saying where assets are frozen, go against them. And assets are almost inevitably frozen in the middle of a transaction and often in EFT. So I'm just curious in what respect you're still looking to the principles of anything to do with Article 4A or whether you're looking more generally to agency or pre-Article 4A common law. It's the principle, the overarching principle of Section 402, right? So I would – just to respond, Judge Pillard, to your point about Section 502 and 503, I would say, taking it a step further, it's not just intention. I would say TRIA preempts those provisions to the extent that they would limit the attachment of a block to EFT. Thanks. Great. Thank you. Now we'll hear from Wells Fargo. Good morning. Good morning. Let's see if I can untangle my mask from my glasses. I hope you can untangle this case, too. I was going to try, Your Honor, to stay very neutral, but I may not be able to help myself from taking a stab at doing a smidgen of untangling. May it please the Court, I'll explicate this for Wells Fargo. As everyone here, I think, totally appreciates, Wells Fargo is a neutral third-party guarantee, and I would just take the opportunity to say the bank is extremely sympathetic to the plaintiffs who have been victims of atrocities and their desire to get these funds. We're also extremely sympathetic to the victims who would get money through the government fund. Where we come at this, and I will get to doing just a smidgen of trying to untangle as I go along, is that this Court noted in Heisser that any interpretation of TRIA should really avoid the risk of punishing innocent third parties. And in particular, this Court called out avoiding punishing a guarantee by exposing the guarantee's own assets to a risk of law. And unfortunately, this is the type of case that poses a meaningful risk of exposing neutral guarantees like Wells Fargo to multiple lawsuits, to inconsistent rulings, and potentially, if everything goes through a series of cascading failures that I've worked many decades to help Wells Fargo avoid in many of these cases, a risk of duplicative liability. If you look at this case alone, for example, Your Honor, we've been sued by the Levens, we've been sued by the Owens plaintiffs, we've been implicated in forfeiture proceedings. This is in D.C., this is in New York, this is in South Dakota. Why are these funds being held in South Dakota? That's a great question, Your Honor. So, two answers. The OSAC regulations… Is Wells Fargo in South Dakota? We have presence there, and I guess for book reasons… No, I mean the town. I'm sorry? The town. Oh, I don't know. I think so, yes. Is that why the bank bears that name? So, what the OVAC regulations say is that once we've blocked it, we have to put it in a separate segregated account. So, that's a matter of regulation. So, then it's just a question of where is that account? And for whatever regulatory or historical or tax reasons, and I genuinely don't know, this decision was made decades ago, that that account for all the blocked assets all over the country would just be segregated in South Dakota. But why – it's a book entry, right? It's an electronic thing that the bank does. Is it earning interest? Yes, statutorily I believe there has to be a certain amount of reasonable interest. It's very minimal. From a bank perspective, and we're not complaining. This is the cost of doing business. It's just a slight burden. It's something we have to do and maintain, and it's a bit of an administrative headache. It becomes a much bigger headache, of course, when everyone comes to fight over the assets. So, look, our primary interest is ensuring a rule of law that doesn't expose Wells Fargo. And this is where I'll take a shot at doing some untangling. It seems to me that there are two choices, right? If this court were to affirm, it seems to me that the way that would be done is just a very straightforward, we believe article 4A of the UCC applies. We're going to stick with it. The district court got it right. Gillen's plaintiffs acknowledged that if you follow every jot and tittle of it, in their words, that they lose, that they're out of luck. And so that's one way of doing it. And we sort of urge that there's some logic to doing it that way, right? You don't split with the Second Circuit. Conversely, if this court is going to reverse, and there are some really good reasons to do that, to be honest, because it really does seem to us to make a certain amount of sense that if TREA is trying to help out these victims and all these assets are being blocked midstream, that they get a shot at doing that. The way that that, I think, intellectually, honestly, has to be done cannot be done by squinting at article 4A until somehow it allows it by some sort of machinations with the money back judgment rule, by putting a tremendous amount of weight on one sentence in Heiser. And if your honors look at that particular sentence, which the sentence says, you wind back to the originator, what that sentence says in full is, we think the district court got it right. You wind back to the originator, cite to the district court. And then when you look at what the district court said, it says, the originator or the originating bank have the claim. So I think that that one sentence doesn't establish that it's necessarily the originator that has the claim and the interest there. It just doesn't do that work. And so if this court is going to reverse, I think the way it gets there is through the Massachusetts rule. And that's an intellectually honest and legitimate way to get there. And what we would say from Wells Fargo's perspective, if I may, is that should the court go in that direction, we would simply ask that the court, as part of crafting federal common law, make perfectly clear that what that does is it displaces the UCC so that we don't have a situation where this court says, hey, federal common law, the Massachusetts rule carries the day. Wells Fargo, please pay out these monies to these victims. And we do so. And then Lloyd shows up, and Lloyd says, well, gee, the UCC is still in effect. We want you to pay us now. So to just make clear, and this is what ‑‑ Fair enough. Yeah, right? That's Judge Sin's point. Exactly, Judge Randolph. And the plaintiffs who advocate for this rule hold up Judge Sin as being the guy who gets it right, the judge who gets it right in terms of how this ought to be done. And we would just say, you know, please, if you go in that direction, also do what this court has admonished, which is to protect us as a neutral third party and simply ‑‑ Let me suggest to you, I'm going to read something and see if you agree with it, that with respect to the application of federal common law, it should be done as to a single issue at a time and requires federal courts to consider whether the issue's outcome is consistent with the federal program. So in other words, you take a look at it, you take it issue by issue by issue, and rather than a global approach, which would be somewhat equal to what the Second Circuit is doing, do you agree with that statement? You take it issue by issue, whether you're going to adopt a particular state law program. Your Honor, I believe I do agree with that, but I'm trying to see the next move down the chess board to make sure I agree with what the implications are. I think if the question then becomes, in taking issue by issue, is it fair to get to the protection of Wells Fargo that we're asking for, I think the answer is definitively yes, it is, because part of what Judge Sin says is, look, in applying this common law and figuring out does the terrorist have the exclusive interest, because you can only, as sort of common law 101, you can only attach as much as the terrorists don't, and in making sure that the terrorist has the exclusive interest, we need to make sure that the upstream banks have stepped aside. And so I think it is part and parcel of addressing this one narrow issue to also say we need to make sure the upstream banks have stepped aside. Either we're going to deem them wiped out, or we're going to require as a precursor that they agree to waive their claims or step aside, as happened in Wells Fargo. Well, it's been accomplished in your submission simply by holding that the exception to the subrogation rule in 4A makes no sense when you're dealing with block buses. But you're not going to have subrogation anyway. Yes, Your Honor. I think that 4A was, as plaintiffs argue, I think rather conventionally, 4A was not designed for this situation. And once the assets are blocked, you're in a whole different world where the considerations of the animated 4A can apply. As in situations in which there is no disconnect because of the failure of the originator bank to follow the instructions of the originator. In that situation, 4A shows who has the interest. And if you're following 4A, it enables the government, number one, to block the assets, and it also enables the debtors to collect. Right. So the trouble that comes up, right, is that that rule of 4A, which makes really good sense when you're trying to allocate who has the risk of a bank failing, starts to look a little arbitrary when you're saying who gets to go after the blocked assets of terrorists. And that's where it gets to be a little bit uncomfortable possibly to follow 4A. Now, in terms of... Just on that, so it's not just the segregation which rule applies. It's also the nature, as the district court quite methodically showed, that the property interest is digested from the originator and moves along through the EFT. Isn't that the other major obstacle to using 4A as the source of the property definition under TRIA? Because then it's not going to be terrorist property where it's found. And that is not wrapped up, is it? Or maybe I'm confusing something with the segregation. Yeah, no, I mean, this is part of what makes a very literal and strict interpretation of 4A complicated for everyone, right, because the government also, you know, OFAC takes the position, and I think the government takes the position, that these assets are attachable to the government, these assets are blockable. Maybe OFAC's a bad example because it has a much broader remit in what it considers attachable. But, yeah, if you take it literally that there's no interest whatsoever by anyone other than the immediate upstream bank, and that's the only interest you recognize, then I think it puts the government in an awkward position as well. And then we are in a world where, again, it's a little tricky to make 4A really work perfectly here because this wasn't designed with this in mind. It's not quite to the contrary. Its whole point, I thought, was to shield the intermediary, you know, beads along the chain of an EFT from creditor action. Shield them. And so to say we're going to borrow anything from Article 4A for the purposes of TRIA, it seems to me that you're mixing oil and water. And obviously my understanding of this is very rudimentary compared to yours, but am I missing something in thinking that there's a, that the whole benefit to the financial world and to banks of 4A seems inimical to what TRIA is about? I don't think you're wrong, Your Honor. I really think that 4A is really about not letting courts jump in the middle, not letting creditors jump in the middle, and protecting transactions moving very quickly so that you either under 4A you stop them before they go or you stop them when they arrive, depending on who owes you the debt, but that you don't stop them in the middle and therefore commerce and banks like Wells Fargo move hundreds of billions of dollars a day. And this is good for all of us who want to be able to pay our mortgage because our money arrives on time, not to have that. But what if the money is blocked? It's a different world. And you were saying, I interrupted you when you were saying that OPEX is either blockable, the United States, you were going on. And I apologize for that. So I guess what I was just saying is in full agreement with you, Your Honor, is that the U.S. government is going to say that they can forfeit these assets in the middle of a transaction that are blocked. And that seems to presume some sort of a property interest, which read very literally, 4A doesn't seem to contemplate exists. Although, as was pointed out, I think there is a difference in the wording of the forfeiture statute that is more broadly looks at interest. And we haven't so far read 3A quite that broadly. But point taken. There's a tension there. Anything more? All right. Thank you, Your Honor. I appreciate it. Thank you. Now we'll hear from the United States. Good morning, Your Honors. May it please the Court. Brian Hudak from the U.S. Attorney's Office on behalf of the United States. I want to pick up where my friend from Wells Fargo left off about what interests are at play, and why can the government block these funds, forfeit them, while 3A creditors cannot detach them. And the reason is because the interests that are blockable under OFAC regulations do far exceed mere ownership interest. As this Court recognized in Heiser, a OFAC block interest or funds, even though Iran had no traditional legal interest in them. I would also direct the Court to J.P. Morgan Chase from the Second Circuit, where there's a lengthy footnote from the Second Circuit explaining the difference between ownership interest necessary for attachment by creditors and what can be blocked. That makes a lot of sense. I see the delta between the definitions of the interests under this discussion. But what – I guess I have two questions. What is left of 3A under the United States' reading? And how long has the United States taken the position that it's taken in this case? Has the United States taken the position it's taken in this case in prior cases? I believe the United States has consistently taken this position in the Second Circuit and here. I don't believe it went on fully on the record in Heiser with regards to this position. I think the question at Heiser that the United States weighed in on in a statement of interest that was put between private parties was whether 3A required an ownership interest in funds for them to be attachable under 3A. And the United States answered in the affirmative, which this Court adopted in its opinion in Heiser. But, Your Honor, just to get back to the delta as well, while we can – My other question was what is left of 3A? Sure. My apologies, Your Honor. What's left of 3A is the ability to go and recover against accounts that are blocked under OFAC regulations. So if a RAND or an Iranian phone company or an instrumentality of a RAND has a bank account at a U.S. financial institution that OFAC blocks, that becomes – obviously, it's property of the instrumentality or agency. It's blocked, and that's 3A applied. The main issue that 3A was designed to prevent, as I understand it, was that exact circumstance where the United States would go and block a bank account of a RAND and say it's OFAC-blocked, no one can touch it. What Congress did with TRIO before it enacted the Compensation Fund statute was to say, no, no, no, terrorist victim creditors under TRIO can go and elect against that account that the United States blocked, notwithstanding the OFAC blocking or IEFA or the executive order. So you acknowledge that more or less the situation of intermediary accounts or correspondent accounts which are used sometimes by terrorists to transfer money, that that is basically taken out of the realm – by your interpretation, that's kind of taken out of the realm of recoverable – sources of recoverable assets under the TRIO. So it's more if there's just actual property or an account in the U.S. It depends. If there is a terrorist organization that is the financial institution who is serving as the originating bank. So if it's a banking bank that's serving and trying to process a U.S. dollar transaction through a U.S. correspondent account, that would still be attachable under TRIO because the originator bank is the one that has an ownership interest in the funds that is being blocked at the intermediary bank. The bank or the bank's client? The bank. So if the bank, the bank then has to be the terror defendant? Correct. So an instrumentality, a front company, a financial institution that is truly an instrumentality or agent of a terrorist state or a terrorist organization, that bank, that financial entity, if they have an ownership – if they are truly a terrorist entity, they have an ownership interest in blocking funds blocked midstream. They are the only one in blocked funds under Article 4A that have an ownership interest as plain or any of them, Article 4A and as the Second Circuit has held. Judge Randolph, to address a few of your questions, the actual wire instructions are in the record. If you look at Joint Appendix 273, that is the swift transaction record from Lloyds Bank indicating its election to use Wells Fargo as the intermediary bank for the transaction. What is the government's position or how does the government explain its authority to block these funds? What is the interest that enabled – what is the Iranian interest that enabled the government to block these funds? So, Your Honor, the definition of property and property interest is quite broad under the OFAC blocking regulations, and we would say it is a future – well, as far as forfeiture goes, it's traceable to a violation. That's all we need. It doesn't need to be the property of. It has to be derived from or traceable from a violation for it to be forfeited under the forfeiture statute. Under OFAC blocking regulations, I mean, it's a paragraph long, but it includes things such as – What's your citation? I haven't looked at it. 31 CFR 594.309, and it is in the Owens – 494 – what? I'm sorry, 494.309. Okay. Okay, go ahead. And also, Your Honor, I would direct the court to the JPMorgan Chase decision from the Second Circuit where it describes that. It's 899 F-3rd 152 at note 4, where they describe the difference in scope between the blocking powers of OFAC and the attachment remedies of TREA, addressing that particular – I'm sorry, that was footnote 4 of – Footnote 4 of JPMorgan Chase from the Second Circuit. Thank you. Your Honor, in talking about what Coleman Fenwick's role was in the transaction, we do understand that they had a separate retainer agreement to provide certain legal advice to TAKE during the transaction, but their role as the holder of the account, they expressly disclaimed being a fiduciary of either Crystal Holdings or TAKE Mining. So in that role where they're holding the bonds and are an escrow agent, they aren't acting as an agent for purposes of ownership for TAKE Mining. Again, TAKE Mining is ultimately the one that ended up with SHIP, albeit through illicit means. So it's a question about how does TAKE Mining continue to have interest in these funds when it's received the benefit of its illicit bargain, that is, that it has the oil tanker within Iran after it was hijacked off the coast. So under your view, under the UCC, Coleman is not an originator? Coleman would be the originator here. As we understand it, Coleman Fenwick, if you look at the swift transactions, Coleman is the originator. It is the originator, not TAKE Mining. The Coleman Fenwick International Law Firm is the originator. So even if you go from a factual standpoint and don't want to address the legal issue here, TAKE Mining, the only Iranian agent or instrumentality, is not found in any of the transaction records for which this wire was transacted. So the court didn't resolve that below. Instead, it relied on the Article 4 resolution. But if the court wants to resolve it on that factual ground, it certainly can do so. The United States also offered, and I know my time is out, but the United States also offered other reasons why these risks should be quashed at the district court, including because they are no longer blocked assets of a terrorist organization. Once the United States obtained its OFAC license and seized them in forfeiture, they ceased being blocked under IEPA, and instead they are seized under forfeiture. But the forfeiture is not complete? It is not complete, Your Honor. But just procedurally how we got here, we got a list of attachments on these funds after the United States executed its arrest warrant on the funds, filed its forfeiture complaint. Policy Journal learned that these were at Wells Fargo. We did not ask where they were, in all honesty. And then creditors came in to try to attach these funds. So you arrested them before they sought to attach them? Correct. So even if we were to disagree with your property analysis, there's a first-in-time battle to be had? Correct. And that time would come in the forfeiture action, presumably, when if the creditors have an identifiable property interest in the rates of the forfeiture action, they would have standing to file claims in that action, and then at that point in time we would resolve the first-in-time. The United States would always have the first in an attachment to block funds. Isn't that correct? That would not be correct, Your Honor. So there are situations where OFAC blocks accounts and blocks transfers, where the United States does not seek to seize arrests and then forfeit them. There are certain circumstances like that. In fact, I think those are circumstances that led to various recoveries and other victims that are pursuing recoveries in the Second Circuit, where there was blocking, but the United States did not seek immediately to forfeit. Is it your position that once the United States gets priority by the first writ of attachment, that therefore other debtors can't come in? The United States' position is once they're seized or arrested in forfeiture, no one can come in and supersede the United States' interest at that point. That's not before you because that would be a priority interest that would be battled out in the forfeiture action who would need risk to be sustained. Where does that rule come from? It comes from, Your Honor, I think just property interest first-in-time, first-in-right. In the common law, it also comes from the forfeiture statute, saying that after an asset is seized and arrested in forfeiture, no other court can issue orders regarding it. What do you do with the TRIA provision that says that notwithstanding any other law, which is why I asked you where it comes from, and you said the common law. What do you do with the TRIA provision that says notwithstanding other debtors, the people having a judgment against Vermont can recover? And, Your Honor, I have an answer, but this is why we would ask the court to exercise restraint on that point because it has not been fully briefed. Notwithstanding any provision of law, this court has tackled with that phrase in numerous cases over numerous years. It has said that that phrase, in certain circumstances, when it comes to statutory jurisdictional requirements, does not create an accession to those statutory jurisdictional arguments. But this issue has not been fully briefed before this court. Well, I understand that, but it seems to me that has some implication with respect to what rule of law we're going to use in determining this case. Yes, Your Honor, and if the court rules that these risks should remain and reverses on that basis and remands for proceedings not inconsistent with its order, there may be other issues that bubble back up to this court, including the, again, not blocked, but seized and arrested in forfeiture. And that's not an argument that we make out of whole cloth. That's an argument that the Fifth and Seventh Circuits have adopted in similar circumstances with regard to assets. So once the government has an OVAC license to affect the forfeiture and has arrested or seized the property, and it is no longer blocked under IEFA, but is seized or arrested in forfeiture, and thus TRIO wouldn't apply. TRIO only applies to assets that are blocked under IEFA. So there's alternative ramps across the risk that we would ask the court if it is going to reverse on the Article IV ownership interest issue that it reverses and remands for the district court to consider those other arguments. I'm sorry, Mr. Hudek. You were saying something about that the notwithstanding any provision of law and how the courts have struggled with that and the meaning that they have given. And you said something about jurisdictional provisions. So if not arising in this context, there is at least one case. I understand that, but just thinking about the coherence of the neighborhood in which we find ourselves, your point about why the notwithstanding language doesn't get in the way, as Judge Randolph was probing, is… Well, the United States believes that it's notwithstanding provision of law, only it applies to statutes and regulations. So it doesn't preempt common law. It doesn't preempt, for instance, the sovereign immunity of the United States. It doesn't preempt the prior exclusive jurisdiction doctrine, which tells that once one court exercises in-ramp jurisdiction over a piece of property, other courts… The Supreme Court has rejected that position, though, hasn't it? That when it talks about law, notwithstanding law, that it doesn't apply to common law. The Supreme Court rejected that, didn't it? Embury Railroad v. Tompkins? Your Honor, I don't believe that's another case. I understand, but this court has struggled with notwithstanding any other provision of law, and at least there's another case coming to you in the similar realm of asset forfeiture that the notice of appeal was just filed, where this issue was squarely teed up in the context of the United States' sovereign immunity. So, again, this is another reason why I would urge the court to exercise restraint on that issue, given that that will come up, if it does come up in this circumstance, when we turn to the forfeiture action, if the court does revert.  Thank you, Your Honor. Thank you very much, Mr. Bidak. So I gather, although we've taken you way over your time, that Ms. Smith and Mr. McGill had hoped to make brief rebuttal, and we'll give you each two minutes. And this time we actually mean two minutes, although my colleagues are free to extend it. Yes, Mike, when they talk, that doesn't count against my time, does it, Your Honor? So to answer one of the questions that Your Honor asked about are there any assets left if you take away EFTs for the victims to go after, there are none. As Judge Randolph quite rightly said in one of his comments, the terrorists are not stupid. Iran is not opening bank accounts in the United States, and neither are its agents or instrumentalities. However, EFTs, interestingly enough, are put into blocked accounts. What we're talking about now is a blocked account held by Wells Fargo. TRIO talks about blocked assets. It does not mention property, but this court in Heiser said we're interpreting TRIO to mean property of the terrorist or its agent or instrumentality. So one thing I will leave you with. I fortunately slightly disagree with my colleague from Gibson, Dunn & Crutcher, who represents the Owens. I believe, as the professors, the amicus brief, please, you will read those who try to walk you through Article 4, 4A, 402. There is the subrogation section, which is in E, but leave that aside for a minute. Forget about the subrogation section. Sections C and D of 402 talk about the money-back guarantee, which Heiser mentioned, and which the professors try to explain is what creates a property interest that remains in the originator all the way down the line, no matter how many banks it goes through. And they refer the court, and everybody reading their brief, to the comments to Section 4A, 402, which talk about the money-back guarantee. And one thing that the comments say is this money-back guarantee assures the originator it will not lose its money if something goes wrong in the transfer. Now, that's just the comments for once, talking in sort of lay terms and trying to lay out something commonsensically. But C and D create a property interest. This court did not hold that it had to be 100% property interest under TRIA, but a property interest. So the originator has a property interest. It is not lost in the process of these transfers, and it is not lost even when the subrogation rules come into effect, unless the originator has chosen the transferring bank that the money is placed in, and that's where it gets lost. If it's lost there, then the originator is subrogated to its bank, and it bears the risk. So I know it's a mouthful and a lot to look at, but I hope you will consider the Amicus briefs in particular, because I think they do give a good roadmap to the UCC and intricacies. But I grant my colleague you can get there in other words. Thank you. Thank you. Thank you, Your Honors. A few quick points. First, I want to underscore that there is no innocent third party here at risk from the rule that we urge. Lloyds has never asserted a claim in two years, and I think the court here fairly could, in this particular case, deem Lloyds to have disclaimed any interest in the funds, and in particular, any claim against Wells. The second point, Judge Randolph, you asked what is the interest that permits the blocking here, and I actually never heard an answer from the government. The government says, and I agree, that it doesn't have to be ownership, that the blocking regulations are broader, but it does have to be identifiable, and it has to map onto the facts of the case. And the government has been very coy and has not actually asserted what it is. The most I heard was something about a future interest. I don't know what future interest Kate could have in these funds under their view of Article 4A. What is the left of TRIA, you asked Judge Pillard. The government said, well, you could have situations where there are Iranian originator banks using U.S. correspondent accounts. That cannot happen. U.S. banks cannot accept transactions from Bank Melli or Bank Satarat or Bank Markazi because they are sanctioned entities. So it would only be by mistake that that would happen. The government says Holman is the originator. Talk about a loophole. This is like worse than Vladimir Putin owning houses in the name of his violinist. This is an agent of the originator. It is their attorney. And, again, I would point the court to the power of attorney document at JA 117. Finally, the point about priority, I know I just point the court to our reply brief at page 14 and the footnote there. But the forfeiture warrant strangely has never been returned in this case, which perhaps raises jurisdictional issues for the government. My very last point is that the government's position here leads to this very strange and arbitrary and incongruous outcome where if only case instructions had been followed, CAFE would be the owner. But, alas, they weren't, so they're not the owner. And I would say when this court is developing federal common law, it can and should do so in a way that accords with the statutory purpose at issue and does not lead to such arbitrary and incongruous outcome. Thank you. Thank you, counsel. The case is taken under advisement.
judges: Pillard, Walker, Randolph